OMAHA GRAIN EXCHANGE, APPELLEE, v. NATIONAL SURETY COMPANY, APPELLANT: CORN EXCHANGE NATIONAL BANK ET AL., APPELLEES.

FILED OCTOBER 18, 1919. No. 20505.

1. **Carriers:** BILLS OF LADING: RIGHTS OF BONA FIDE PURCHASER. Where the owner of goods has clothed another with apparent ownership through the possession of an indorsed bill of lading, or one made out to bearer, a *bona fide* purchaser or pledgee for value to whom such bill of lading is transferred, or to whom a receipt is transferred that has been obtained by means of the possession of the bill of lading that shows title to such bill of lading in the person transferring the receipt, is protected, because the real owner is estopped from asserting ownership when he voluntarily places the means within the hands of another with which to mislead persons who without notice advance value thereon.

2. **Subrogation: Rights of Surety.** The right of a surety to be subrogated to the rights of a creditor is not prejudiced by a stipulation between creditors and the principal that certain perishable property shall be sold and the proceeds delivered to a trustee to be held to await the decision in a suit to be brought against the surety, where, the suit having been commenced, the trustee is made a party and the fund held by him is subject to the court's order.

3. **Principal and Surety: Subrogation.** The dismissal by a creditor of a replevin suit against a defendant, who is the principal on a surety bond, where the sheriff's return shows "no property found," does not affect the surety's right of subrogation, and he is not thereby discharged.

Appeal from the district court for Douglas county: Willis G. Sears, Judge. *Affirmed.*

*Alvin F. Johnson,* for appellant.

*Smith, Schall & Howell, contra.*

Dean, J.

This suit was brought by the Omaha Grain Exchange on a surety bond to recover a balance of $2,993.05, the purchase price of five cars of grain separately sold by the Holmquist Elevator Company, the Vincent Grain Company, and the Beal-Vincent Grain Company, the latter two being practically the same company, to William B. Weekes, doing business as the Weekes Grain Company. These parties will be hereinafter referred to as Holmquist, Vincent, and Weekes, respectively. Weekes and the three sellers were all members of the Omaha Grain Exchange, and to the exchange the several claims for the unpaid purchase price were assigned for collection.

The exchange, to secure to the sellers payment for all grain purchased by Weekes on its trading floor, had, pursuant to its rules, exacted of him a bond in the penal sum of $10,000. The bond sued on was executed by the National Surety Company. Weekes became insolvent and was unable to pay the claims in controversy. Neither Weekes nor the Weekes Grain Company made any appearance in the case and as to them a default was

entered. When the taking of testimony was concluded, both parties moved for a directed verdict, whereupon the court, by consent of the parties, discharged the jury and retained the case for determination. It appearing from the evidence that the Corn Exchange National Bank and H. S. Clarke, Jr., its vice president, were necessary parties, they were by the court's order joined as defendants, and filed pleadings disclosing their interests in the proceeds of the grain.

Judgment was rendered in favor of plaintiff and against Weekes and his surety for $2,993.05, with interest from August 10, 1916. Defendant Clarke, having at the time in his possession the proceeds of the sale of grain in question, under a stipulation or agreement entered into by certain of the parties in interest that will presently be noted, was ordered by the judgment of the court to deliver to the Corn Exchange National Bank such proceeds as he held in his hands. The surety alone appealed.

The three sellers at the time the sale was made delivered the five bills of lading to Weekes, and, pursuant to a custom of the exchange, Weekes gave to the respective sellers a separate receipt for each of the five bills of lading covering the grain purchased. Within a day or two Weekes sold four of the cars of grain to the Van Wickle Grain & Lumber Company, to whom he delivered the four bills of lading; and from whom he accepted four of the same kind of receipts for the bills of lading that he had given to the sellers. The receipts are all the same in form. A copy follows:

"Omaha, Neb., June 21, 1916.

"No. ——. Received of the Weekes Grain Company, of Omaha, Nebraska, bill of lading executed by the C. & N. W. R. Co., and dated at Verdell, Neb., covering a car of wheat, for which the undersigned agrees to pay to the Weekes Grain Company, the sum of 91 cents per bushel within seven days from date hereof, or, if not unloaded, will advance 75 per cent. of the value upon

surrender of this receipt. Said bill of lading describes said car as No. 139036. Initials C. N. W., capacity 49,630 pounds. It is agreed by us that the title to said bill of lading and contents of said car shall remain in the Weekes Grain Company, or their assigns, until the undersigned has paid the Weekes Grain Company, or their order, the entire purchase price of said grain at said rate. Upon full payment to the Weekes Grain Company, or order, of said purchase price as aforesaid, and the surrender of this receipt, the title to said bill of lading and contents of said car shall pass to the undersigned.

"Van Wickle Gr. & Lbr. Co.

"By E. Thompson."

Shortly thereafter Weekes procured loans from the Corn Exchange National Bank, giving his notes therefor, upon which $3,698.27 remains unpaid. At the time the loans were made and as collateral security therefor, he gave to the bank the four Van Wickle receipts and the bill of lading covering the remaining car of grain.

Soon afterwards Weekes became insolvent. The sellers, not having been paid, then began separate replevin suits in the district court at Council Bluffs, Iowa, to recover possession of the grain. While these suits were pending, Van Wickle, not having paid for the grain, because some of the parties hereto were making claim to the grain or the proceeds thereof, began a suit in the district court for Douglas county, that is referred to in the record as an action of interpleader, making the sellers and the Corn Exchange National Bank and Weekes parties defendant and praying for a disclosure of their respective rights to the grain, if any, then in the possession of Van Wickle.

While the interpleader suit at Omaha and the replevin suits at Council Bluffs were yet pending and undetermined, the parties to the former suit entered into a written agreement which provided generally that the Van Wickle Company, herein referred to as Van Wickle,

should sell the grain and from the proceeds deliver to Clarke $3,698.27, the amount remaining due the bank on Weekes' notes and pay the remainder to the sellers; that Clarke was to hold the money so delivered to him to await the decision in a suit to be brought against the surety on the bond given to the grain exchange, namely, the present suit. In case the surety company prevailed, it was provided that Clarke should deliver the money to the sellers as their respective interests should appear. This provision also appears:

"But in the event that it is not so decided, or that said Holmquist Elevator Company, Vincent Grain Company, and Beal-Vincent Grain Company receive from said surety company, either before or after the said action has been commenced, all money coming to them because of or on account of any claim against, or right in, said grain or said $3,698.27, then all rights of the Holmquist Elevator Company, Vincent Grain Company, and Beal-Vincent Grain Company against said grain or said $3,698.27, placed in the hands of the said Clarke as aforesaid, shall be deemed satisfied and fully discharged," etc.

Under the stipulation, the grain having been sold by Van Wickle and the proceeds having been distributed pursuant to its terms, and the sheriff having returned the replevin writs "no property found," the replevin suits were dismissed. The interpleader suit is still pending and awaiting the result of this action.

The surety company argues: "Appellant therefore contended in the trial below that plaintiff's assignors had, by their own acts, abandoned, released, and impaired their rights in and to the grain in question, in such a manner to defeat appellant's right as surety to be subrogated thereto, upon performing its obligation as surety and paying for the grain, and therefore appellant (the surety) was released from its liability *pro tanto.*"

One of the acts complained of relates to the replevin suits begun and later dismissed by the sellers, without

the surety's knowledge. In view of the evidence on this point and of the sheriff's return, "no property found," we are unable to discover wherein defendant was prejudiced. No lien was obtained, and consequently none was abandoned. *Eickhoff v. Eikenbary*, 52 Neb. 332; 21 R. C. L. 1044, sec. 88.

In effect, too, the surety charges that the stipulation referred to herein defeated its right of subrogation to whatever title or interest plaintiff's assignors, the sellers, had in the grain after it reimbursed them for the losses sustained by Weekes' default. We do not think so. The surety was not a party to the stipulation and of course is not bound by it. The proceeds of the sale are properly safeguarded. Demurrage, storage, and insurance charges, and loss from waste, and the like have been avoided. All interested parties are in court, and the fund in dispute is in the hands of a party to the suit by whom it is held subject to the court's order. We are unable from the record to discover wherein the surety has been prejudiced in the respects noted. The right of the surety to be subrogated to such rights as plaintiff's assignors may have to the fund, on payment of the losses incurred by them, is of course, conceded, and unless such rights are inferior to those of the bank, then the surety as against the bank must prevail.

The question then is: Who has the superior right to the funds now in the hands of Clarke? Is it the surety company, standing as it does in the place of plaintiff's assignors or the bank that made the loan to Weekes?

The receipts on which Weekes obtained the money from the bank on the face are regular. The presumption would be that they spoke the truth. A person to whom they would be presented for negotiation would, from the recitals thereon, naturally presume that they would not have been issued unless the holder was the owner of the bills of lading. The receipts were apparently

issued pursuant to section 9, art. 6 of the by-laws of the exchange. So much of the rule as is here applicable follows:

"Where a bill of lading is transferred and the party receiving the same issues and delivers to the person surrendering the bill of lading a receipt therefor, stating that the title to the grain covered by said bill of lading shall remain in the party holding said receipt, until the same is fully paid for, the person issuing such receipt is hereby prohibited from accepting or receiving advances on such bill of lading, or negotiating the same, so long as the receipt therefor is outstanding."

While there is no evidence that any of the bank officers knew of the existence of the rule, nevertheless, under the circumstances, even if the rule had been known to the bank, it would have justified the bank's course of dealing with Weekes in the premises. It has not been made to appear that the bank officer who dealt with Weekes, nor any person connected with the bank, had notice of any facts connected with the transaction that would put a reasonably prudent man on inquiry respecting the *bona fides* of the receipts that were presented by Weekes.

Where the owner of goods has clothed another with apparent ownership through the possession of an indorsed bill of lading, or one made out to bearer, a *bona fide* purchaser or pledgee for value to whom such bill of lading is transferred, showing title to such bill of lading, is protected, because the real owner is estopped from asserting ownership when he voluntarily places the means within the hands of another with which to mislead persons who without notice advance value thereon. It is obvious that a receipt, obtained by means of a bill of lading, showing title to such bill of lading in the holder of the receipt, would be as effective a means of misleading *bona fide* purchasers or pledgees for value as the bill of lading itself. *Pollard v. Reardon,* 65 Fed. 848; *Munroe v. Philadelphia Warehouse Co.,* 75 Fed.

545; *Commercial Bank v. Armsby Co.*, 120 Ga. 74; *Commercial Nat. Bank v. Canal-Louisiana Bank & Trust Co.*, 239 U. S. 520; Mechem, Sales, sec. 166; Williston, Sales, sec. 425; 10 C. J. 207, sec. 276. In the *Pollard* case it is said: "There is every reason found in the law of equitable estoppel and in sound public policy for holding, and no injustice is involved in holding, that, if one of two must suffer, it should be he who voluntarily puts out of his hands an assignable bill of lading, rather than he who innocently advances value thereon." On this point the *Pollard* case is cited with approval by Mr. Justice Hughes in the *Commercial Nat. Bank* case.

We conclude that the district court did not err in holding that the bank was a *bona fide* pledgee, without notice, of the collateral given to it by Weekes, and that plaintiff's assignors, having surrendered to Weekes the bills of lading, were therefore estopped from asserting title under the terms of the conditional sales to Weekes as against the bank. That the rights of the surety are no greater than those of plaintiff's assignors is obvious. Both parties moved for a directed verdict, and, as herein noted, the court discharged the jury and retained the case for determination. Under the rule, the findings of the court take the place of a verdict on disputed questions of fact, and they are so treated by this court on appeal.

There is sufficient evidence to support the findings and judgment. We do not find reversible error, and the judgment is therefore

AFFIRMED.

SEDGWICK, J., concurs in the conclusion.

MORRISSEY, C. J., not sitting.